IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THOMAS FRANKLIN HOUCK, )<br>)<br>Defendant. ) | Case No. 16-05010-01-CR-SW-MDH |

### REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendant Houck filed a Motion to Suppress any and all evidence or statements obtained as a result of a July 2, 2015 warrantless search of Defendant's Cedar Creek fifth-wheel ("RV"), the seizure of any items from the RV, and any and all statements made by Defendant or evidence discovered after the search and seizure as fruits of the poisonous tree. (Doc. 20.) The undersigned held a suppression hearing on February 28, 2017. (*See* Docs. 28-31.) Defendant was present with his attorney, Tyson Martin, and the Government appeared by Assistant United States Attorney James Kelleher. (Doc. 31.) During the hearing, the Court heard evidence from Keith Kreider ("Det. Kreider"),[1] a Detective Sergeant with the Manheim Township, Pennsylvania, Police Department; and Preston Gentzler ("Det. Gentzler"), a Detective with the East Lampeter Township, Pennsylvania, Police Department. For the reasons set forth below, it is **RECOMMENDED** that Defendant's Motion to Suppress, (Doc. 20), be **GRANTED IN PART AND DENIED IN PART**.

---

[1] Although currently retired, at the time of the events discussed herein, Det. Kreider was a Detective Sergeant with the Manheim Township Police Department. As such, he is referred to as Det. Kreider throughout this Report.

## I. Findings of Fact[2]

On July 2, 2015, after conducting an investigation into the receipt and distribution of child pornography via the ARES peer-to-peer network, Det. Kreider and his team[3] served a search warrant on the premises of 720 Holly Tree Road, Manheim, Pennsylvania. The search warrant application specifically listed the property to be searched as "720 Holly Tree Road, Manheim, PA 17545 (Penn Township), single story, single family dwelling with cream colored siding and burgundy trim. Porch supported by white posts. The number 720 is posted at the end of extended driveway leading to two car garage." (Gov't Ex. 1.) Items to be searched and seized included any vehicles present at the time of the execution of the search warrant. (*Id.*)

On or around June 23, 2015, prior to applying for a search warrant for 720 Holly Tree Road, Det. Kreider performed surveillance on the property. Through his surveillance of the property, Det. Kreider observed an RV and a black Chevrolet pickup truck in the driveway belonging to homeowner Audrey Houck-Johnson ("Johnson"). Det. Kreider identified the RV and the truck as belonging to Defendant.[4] The RV[5] and the truck were detached and parked separately. Det. Kreider did not observe Defendant entering or leaving the RV at any time during his surveillance of the property.

Law enforcement arrived at the property at approximately 6:22 AM on July 2, 2015. During the law enforcement briefing the morning of the execution of the search warrant, Det. Kreider informed the other officers that it was possible that Defendant would be in the RV when

---

[2] The facts set forth herein are taken from the testimony adduced at the hearing on the instant Motion and the exhibits admitted during the hearing. The hearing transcript appears as Doc. 31; the Government's Exhibit Index appears as Doc. 29; and Defendant's Exhibit Index appears as Doc. 30.

[3] Det. Kreider was joined by: Lancaster County District Attorney Investigation Division ("LCDAID") Detectives Greg Wahl and John Duby and Analyst Ryan Harrison; Northern Lancaster County Regional Police Department ("NLCRPD") Detective Theresa Stauffer and Officer Robert Leh; and Lancaster County Computer Crimes Taskforce ("LCCCTF") Detectives Preston Gentzler and Keith Neff and Trooper John Sours. (Doc. 24.)

[4] According to Defendant, he was visiting his mother, Johnson, at that address at the time of the execution of the search warrant. (Doc. 20.)

[5] The RV was a fifth-wheel camper which possessed no independent means of propulsion or steering.

2

they arrived at the property. When law enforcement approached the house, they noticed the air conditioning in the RV was running. The RV was still detached from the truck and was braced, leveled, and completely extended. Additionally, the RV had water and electric lines running to it and had a satellite dish attached to the roof. Det. Kreider believed Defendant was staying in the RV but was not certain.

Det. Kreider, a second detective, and a uniformed officer proceeded to the front door of the residence. Two other detectives proceeded to the door of the RV. Det. Kreider made contact with Johnson at the front door of the residence. The other detectives made contact with the occupants of the RV, Defendant and his girlfriend, Cheryl Shelly ("Shelly"), and requested they enter the residence so law enforcement could read the execution of the search warrant.

Once all parties were present in the residence, Det. Kreider read the execution portion of the search warrant. Det. Kreider then advised all parties that no one was under arrest, that law enforcement had no intention of arresting anyone at that time, and that all parties were free to leave at any time. Det. Kreider then explained to the parties that law enforcement was looking for computers with the ARES software installed. While Johnson and Shelly admitted to owning computers, neither had heard of the ARES software. Defendant admitted to owning a laptop computer and to having the ARES software installed. Defendant advised law enforcement that his computer was located in the RV and offered to voluntarily produce the computer for law enforcement. Det. Kreider declined Defendant's offer and stated that law enforcement would retrieve the computer during the search.

Defendant voluntarily agreed to speak with detectives at the police station. Defendant was given permission to retrieve clothes and shoes to wear prior to leaving with Det. Gentzler in Det. Gentzler's unmarked Ford Focus. Det. Gentzler drove both Defendant and Det. Neff to the

3

station. Defendant was repeatedly advised, both on the ride to the station and during the interview, that he would be considered a visitor and could terminate the interview at any time and law enforcement would transport him back home. The drive took approximately five minutes.

After Defendant left the property, law enforcement officers commenced the search of Defendant's RV. During the search of the RV, law enforcement seized Defendant's Acer laptop computer, an Apple iPhone 6, and an Olympus XD picture card. When law enforcement went to the trailer to begin the search, it did appear that people were staying in the trailer at that time.

Defendant's interview began 6:56 AM. During the interview, Defendant informed Det. Neff and Det. Gentzler that he had ARES installed on his computer for approximately five or six years and that his username was "sbullet." Det. Neff asked Defendant if he had any other computers or data storage devices and Defendant stated he owned a thumb drive for his "trucking stuff." When asked what he used ARES for, Defendant admitted to occasionally accidentally downloading child pornography while downloading adult pornography. Defendant stated that if he realized the videos depicted child pornography when he viewed them, he would delete them. Later, Defendant admitted to searching specifically for child pornography. Defendant stated that during the time he had used ARES, hundreds of pornographic videos depicting children of various ages had been downloaded to his computer, viewed, and deleted.

At the police station, Det. Neff was receiving real-time updates from officers executing the search. During the interview, Det. Gentzler and Det. Neff were informed by law enforcement at the property that the password Defendant provided for his phone did not work. Defendant then provided the correct password to Det. Neff. Later, Det. Neff informed Defendant that law enforcement at the property had located child pornography. Det. Gentzler testified at

4

the suppression hearing that the information being provided by law enforcement at the property did play a role in directing the interview with Defendant. Defendant's interview lasted fifty-three minutes.

On July 10, 2015, LCCCTF Det. John Duby performed a detailed forensic examination of Defendant's computer. During that investigation, Det. Duby determined that numerous external data storage devices had, at one time, been connected to Defendant's computer as recently as June 26, 2015.[6] None of these devices had been recovered during the search of Defendant's RV.

On July 20, 2015, Det. Kreider applied for a second search warrant based on information obtained during the search of Defendant's computer and information provided by Defendant during the interview with Det. Neff and Det. Gentzler. The search warrant obtained on this date, in the specific description of premises to be searched, included a description of Defendant's RV. During this second search, law enforcement seized an Olympus digital camera with case and a Sony Handycam with case.

## II. Conclusions of Law

Defendant contends that law enforcement exceeded the scope of the search warrant and violated his Fourth Amendment rights by searching his RV and seizing his computer because (1) Defendant's RV was a residence, and not a vehicle, and (2) the RV was not specifically described in the search warrant or the supporting affidavit. As a result, the Defendant argues that any and all evidence and or statements obtained as a result of the search of Defendant's RV must be suppressed. Additionally, Defendant argues that any and all evidence and statements derived from the seizure and search of his computer should be suppressed as fruits of the poisonous tree.

---

[6] While not enumerated in the record, the Government's brief contends that during the search of Defendant's computer, Det. Duby located: two video files containing child pornography; 239 video file titles indicative of child pornography that had been played by the Div-X program on Defendant's computer; and at least 1,900 files with "PTHC" in the title had been downloaded by Defendant using the ARES program. (Doc. 24.)

5

The Government responds that Defendant's RV was a vehicle and the search warrant explicitly authorized the search of the RV because it was a vehicle located on the premises at the time of the search. Moreover, the Government contends that even if the search warrant was not sufficient to approve a search of Defendant's RV, the RV was subject to the Fourth Amendment's vehicle exception in this case. Additionally, the Government asserts that even assuming *arguendo* that Defendant's RV was not a vehicle, the inevitable discovery doctrine applies. Therefore, the Government contends that evidence and statements derived from the search of Defendant's RV and seizure of Defendant's computer do not need to be suppressed. The Court takes up the parties' arguments below.

## A. Defendant's RV was a residence and law enforcement's warrantless search violated Defendant's Fourth Amendment rights.

The threshold question in this case is whether Defendant's RV was a residence or a vehicle for purposes of the Fourth Amendment. After examining applicable case law, the Court finds that Defendant's RV was a residence at the time of the search.

"Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls." *California v. Carney*, 471 U.S. 386, 392 (1985) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). For a motor home or RV to qualify as a vehicle, it must be both readily mobile and situated such that it would objectively appear to be "being used for transportation." *Id.* at 394. Factors relevant to determining whether an RV is a vehicle include the location, license status, connection to utilities, and convenient access to a public road. *Id.* at 394 n.3. Law enforcement need not determine the "actual functional capacity of a vehicle [.]"*United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987). When determining if a vehicle is readily mobile, courts look at what is "[reasonable] under all the circumstances." *Id.* (citation

6

omitted). Thus, in determining whether Defendant's RV was a vehicle or a residence, the Court must examine: (1) whether Defendant's RV was either in use on a public road or capable of being used on a public road; and (2) whether it objectively appeared the RV was being used for transportation.

The Government cites several cases in support of its assertion that Defendant's RV was a vehicle and was therefore covered under the vehicle paragraph of the search warrant. However, these cases are not factually analogous to the case at bar and are therefore unpersuasive. *See United States v. Nichols*, 344 F.3d 793 (8th Cir. 2003) (search of the defendant's separate residence in a converted garage did not exceed the scope of the search warrant because it was specifically described as a place to be searched); *United States v. Tamari*, 454 F.3d 1259 (11th Cir. 2006) (the search of a Humvee that appeared on the scene during execution of a search warrant permitting search of vehicles on the premises did not exceed the scope of the warrant); *United States v. Napoli*, 530 F.2d 1198 (5th Cir. 1976) (camper parked in a driveway of a home that was the subject of search showed no signs of being used as a residence); and *Heffernan v. State*, 385 So. 2d 1060 (Fla. Dist. Ct. App. 1980) (search of camper used as a living space did not exceed the scope of a valid warrant authorizing the search of everything within the curtilage of the residence when the camper and the residence were owned by the same individual). *Heffernan* appears at first glance to be factually analogous to the instant matter; however, it was decided some five years prior to *Carney* and therefore does not properly apply the rule set out by the Supreme Court in *Carney*. Additionally, the Government misstates the rule as set out in *Carney*. While *Carney* does apply the warrantless search exception to motor homes and recreational vehicles, the test is two-fold; there must be both ready mobility and the objective appearance of being used for transportation. *Carney*, 471 U.S. at 394.

7

An examination of cases decided by other courts shows that outcomes are factually contingent. *See Starling v. United States*, 2011 WL 281054 (D. W.D. Mo. 2011) (search of camper in motel parking lot did not exceed the scope of a search warrant for defendant's motel room when the warrant authorized the search of vehicles on the premises associated with defendant); and *United States v. Adams*, 845 F. Supp. 1531 (D. M.D. Fla. 1994) (search of a motor home located on a rural, private lot, and being used as a residence was not covered by the vehicle exception). *See also United States v. Pile*, 820 F.3d 314, 316 n.2 (8th Cir. 2016) (defendant's camper was his home); and *United States v. Ervin*, 907 F.2d 1534 (5th Cir. 1990) (search of camper trailer parked in a motel parking lot and not being used as a home fell within the scope of the automobile exception).

While not binding on this Court, a 2017 District of Kansas decision is particularly instructive. In *United States v. Briscoe*, the defendants were living inside an RV that was parked behind a single-family residence owned by a different party. *United States v. Briscoe*, 2017 WL 1908594, *1 (D. Kan. May 10, 2017). Law enforcement officers in *Briscoe* were aware of the existence of the RV, and that the defendants were living there, prior to executing a search warrant on the single-family residence. *Id.* The *Briscoe* court held the search of the RV exceeded the scope of the warrant and violated the defendant's Fourth Amendment rights because: an RV is not a regular vehicle; law enforcement found the defendants asleep inside and not behind the wheel; and law enforcement knew, prior to executing the search warrant, that the defendants were residing within. *Id.* at *6. Ultimately, law enforcement "should have known that this was a separate residence that required a separate warrant before searching it." *Id.*

This case is distinguishable from *Briscoe* in that, unlike the RV in *Briscoe*, Defendant's RV was readily moveable and thus satisfies the first requirement for a vehicle exception to apply.

The evidence shows it was not permanently affixed to the property or otherwise incapable of moving. (Doc. 31.) Additionally, the RV's tires were fully inflated, and the RV possessed a license and vehicle inspection tag issued by the State of Missouri. (*Id.*) Moreover, Defendant's truck was parked nearby and possessed a trailer hitch and was presumably capable of hauling the RV. (*Id.*) Thus, while the RV was not immediately mobile, it possessed the ability to be mobile within a short period of time. Therefore, under all the circumstances it is reasonable to conclude that Defendant's RV was readily mobile.

However, Defendant's RV was not objectively being used as transportation at the time of the search and therefore does not satisfy the second requirement of *Carney*. By the time Det. Kreider was performing his surveillance on the residence, the RV was already parked on private property. (*Id.*) It had been leveled, was fully extended to maximize the indoor living space, was hooked up to electricity and water, and had a satellite dish attached to the roof. (Doc. 31, Gov't Ex. 3.) Furthermore, the door possessed a lock, the stairs were lowered, and a garbage can and grill were located outside the door. (*Id.*) When officers arrived at the residence, the air conditioning in the RV was running, and Defendant and Shelly were located in the RV by law enforcement. (Doc. 31.) Moreover, Det. Kreider testified that he believed Defendant was staying in the RV at the time he applied for the search warrant.[7] (*Id.*) He further stated that upon entering the RV, it did appear that someone was living there. (*Id.*) Thus the evidence, when viewed by an objective observer, supports the finding that the RV was a residence and required a

---

[7] The Court is not persuaded by law enforcement's belief that a search of Defendant's RV was authorized pursuant to the warrant obtained on July 1, 2015 because it was a vehicle. Presumably, if law enforcement understood the RV to be a vehicle, when applying for the second warrant it would have been unnecessary for Det. Kreider to particularly describe the RV as a place to be searched. Det. Kreider testified that he included the RV in the second warrant because it was located on the property and was also related to Defendant. (Doc. 31.) However, despite possessing that knowledge prior to the original search on July 2, 2015, and despite having a belief that Defendant was residing in the RV prior to entry, law enforcement did not seek a second warrant specifically for Defendant's RV at that time. (*Id.*)

9

separate warrant.  *Briscoe*, 2017 WL 1908594 at *6.  Because the RV was a residence and not a vehicle, the automobile exception cannot apply.

Having determined the RV to be a residence, the Court must now determine whether the search of the RV violated Defendant's Fourth Amendment rights.  The Fourth Amendment protects individuals from unreasonable searches and seizures by government actors.  U.S. Const. amend. IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005).  A Fourth Amendment search occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).  In general, a warrantless search of a home is presumptively unreasonable.  *Pile*, 820 F.3d at 316.  A valid warrant must "particularly [describe] the place to be searched and the persons or things to be seized."  *United States v. Timley*, 443 F.3d 615, 622 (8th Cir. 2006) (internal quotation and marks omitted).  Such specificity is required in order to avoid any reasonable probability that another place might mistakenly be searched.  *United States v. Alberts*, 721 F.2d 636, 639 (8th Cir. 1983).  Any evidence obtained as a result of a search which exceeds the scope of the warrant is subject to the exclusionary rule.  *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (internal quotation and marks omitted).  Moreover, "any evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree'" is also subject to exclusion.  *United States v. Segura*, 468 U.S. 796, 804 (1984) (quotation omitted).  Government actors executing a search warrant "must ensure that the search is conducted in such a way that minimizes unwarranted intrusions into an individual's privacy."  *United States v. Gregoire*, 2009 WL 5216844, at *8 (D. Minn. Dec. 29, 2009), *aff'd*, 638 F.3d 962 (8th Cir. 2011) (quotation omitted).  Therefore, searching anywhere, or anything, other than what is particularly described in the warrant exceeds the scope of the warrant.  *United States v. Pennington*, 287 F.3d 739, 744

10

(8th Cir. 2002) (quotation omitted). Once a defendant alleges sufficient evidence for the court to grant a suppression hearing, it becomes the government's burden to prove that a warrantless search is justified. *United States v. Madrid*, 152 F.3d 1034, 1037 (8th Cir. 1998).

Society is prepared to recognize an expectation of privacy in a residence. Therefore, because Defendant's RV was a residence and not a vehicle, any search of the RV or seizure of items within would require a search warrant. The warrant must be based on probable cause and particularly describe the RV as a place to be searched. Det. Kreider testified to his belief that there existed sufficient probable cause to obtain a search warrant based on statements Defendant made to law enforcement prior to leaving the property for the police station. (Doc. 31.) However, Det. Kreider did not seek a second search warrant at that time. Rather, officers proceeded to execute the warrant that did not describe Defendant's RV as a place to be searched at all, let alone with any particularity. (Gov't Ex. 1.) The only place to be searched described in the warrant executed on July 2, 2015 was the residence at 720 Holly Tree Road and vehicles on the property. (*Id.*) Because Defendant's RV was a residence and was not described in the search warrant executed on July 2, 2015, the search of the RV exceeded the scope of the search warrant in violation of Defendant's Fourth Amendment rights.

**B. The unlawful search of Defendant's RV is not excused by the inevitable discovery doctrine.**

Evidence obtained in violation of an individual's Fourth Amendment rights is subject to the exclusionary rule. *United States v. Risselman*, 646 F.3d 1072, 1078 (8th Cir. 2011). Exclusion is not required if the evidence inevitably would have been obtained by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). Inevitable discovery applies if the Government can prove, by a preponderance of the evidence, "(1) that there was a reasonable probability that the evidence

11

would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998) (quotation omitted). The constitutionality of law enforcement conduct in light of a warrant later found to be invalid must be judged "in light of the information available to them at the time they acted." *United States v. Williams*, 917 F.2d 1088, 1090 (8th Cir. 1990) (quotation omitted).

While the Government's argument satisfies the first prong of the inevitable discovery doctrine in this case, it fails on the second prong. As to the first prong, Defendant informed law enforcement, prior to leaving with Det. Gantzler for the police station, that his computer had ARES installed and that it was located in the RV. (Doc. 31.) Det. Kreider testified that he believed he had probable cause to obtain a search warrant for the RV based on the statements Defendant made to law enforcement prior to leaving for the police station. (*Id.*) Moreover, Det. Kreider testified that if he believed the RV to be a residence, he would have applied for an additional warrant because he did not intend to leave the premises without Defendant's laptop computer. (*Id.*) Therefore, there was a reasonable probability that the evidence obtained as a result of the search of the RV and seizure of the computer would have been discovered by law enforcement.

As to the second prong, the Government contends that the interview with Defendant was separate and independent of the search of Defendant's RV. The evidence in the record does not support the Government's contention as it shows the interview was not separate and independent of the search of the RV and seizure of the computer. The search of the RV, as well as the subsequent seizure and superficial search of Defendant's computer, happened contemporaneously to Defendant's interview at the police station. (*Id.*) Det. Gentzler and Det.

12

Neff were receiving real time information from the scene of the search during the interview. (*Id.*) Det. Gentzler testified that the information being received from the scene directed the interview with Defendant. (*Id.*) If the information shared by the officers conducting the search directed the course of the interview, the interview cannot qualify as independent of the search of the RV and seizure of the computer. The record indicates that the interview and the search of Defendant's RV were part of a linear progression from the investigation by the cyber-crimes task force to the discovery of child pornography on Defendant's computer. Therefore, the Government's contention that the interview of Defendant and search of Defendant's RV and seizure of Defendant's computer are substantial, alternative lines of investigation fails the second prong.

Therefore, the suppression of the video files and file names found as a result of the search incident to the unlawful seizure of Defendant's computer, as well as the statements made by Defendant during the interview at the police station, and any other evidence derived as a result of the search of Defendant's RV on July 2, 2015 is appropriate. Additionally, the suppression of any evidence obtained as a result of the second search warrant dated July 20, 2015 is also appropriate as they are fruits of the poisonous tree. As Defendant's statements made to law enforcement while still on the property at 720 Holly Tree Road occurred prior to the search of Defendant's RV, suppression of those statements is not appropriate.

### III. Recommendation

Based on the foregoing discussion, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress Evidence, (Doc. 20), be **GRANTED IN PART AND DENIED IN PART.** It is recommended that the motion be **GRANTED** to the extent it seeks suppression of evidence obtained as a result of the search of Defendant's RV on July 2, 2015, the seizure and search of

Defendant's computer, Defendant's statements made during the interview at the police station on July 2, 2015, any evidence obtained as a result of a search incident to the search warrant on July 20, 2015, and any evidence or statements derived as a result of subsequent searches and seizures. It is recommended that the motion be **DENIED** to the extent it seeks suppression of statements Defendant made on July 2, 2015 while still located on the property at 720 Holly Tree Road and prior to being interviewed at the police station.

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: June 16, 2017